John Geddes LAWRENCE and
Tyron Garner, Appellants,

v.

The STATE of Texas, Appellee.

Nos. 14–99–00109–CR, 14–99–00111–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 15, 2001.

Mitchell Katine, Houston, Susanne B. Goldberg, Ruth E. Harlow, New York, NY, for appellants.

William Delmore, III, Houston, for appellee.

## OPINION

HUDSON, Justice.

Appellants, John Geddes Lawrence and Tyron Garner, were convicted of engaging in homosexual conduct. They were each assessed a fine of two hundred dollars. On appeal, appellants challenge the constitutionality of Section 21.06 of the Texas Penal Code, contending it offends the equal protection and privacy guarantees assured by both the state and federal constitutions. For the reasons set forth below, we find no constitutional infringement.

While investigating a reported "weapons disturbance," police entered a residence where they observed appellants engaged in deviate sexual intercourse.[1] It is a Class C misdemeanor in the State of Texas for a person to engage "in deviate sexual intercourse with another individual of the same sex." TEX. PEN.CODE ANN. § 21.06 (Vernon 1994). However, because appellants subsequently entered pleas of *nolo contendere*, the facts and circumstances of the offense are not in the record. Accordingly, appellants did not challenge at trial, and do not contest on appeal, the propriety of the police conduct leading to their discovery and arrest. Thus, the narrow issue presented here is whether Section 21.06 is facially unconstitutional.

### EQUAL PROTECTION

In their first point of error, appellants contend Section 21.06 violates federal and state equal protection guarantees by discriminating both in regard to sexual orientation and gender.[2]

> No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws.
>
> U.S. CONST. amend. XIV, § 1.
>
> All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public service.
>
> TEX. CONST. art. I, § 3.

1. "Deviate sexual intercourse" is defined in Texas as "any contact between any part of the genitals of one person and the mouth or anus of another person; or ... the penetration of the genitals or the anus of another person with an object." TEX. PEN.CODE ANN. § 21.01 (Vernon 1994).

2. Appellants rely upon the Fourteenth Amendment of the United States Constitution and two provisions of the Texas Constitution, namely, Article I, sections 3 and 3a:

The universal application of law to all citizens has been a tenet of English common law since at least the Magna Carta, and our whole system of law is predicated on this fundamental principle. *Truax v. Corrigan,* 257 U.S. 312, 332, 42 S.Ct. 124, 66 L.Ed. 254 (1921). Nevertheless, our federal constitution did not originally contain an express guarantee of equal protection. While an assurance of equal protection could be implied from the Due Process Clause of the Fifth Amendment, this rudimentary guarantee was complicated by constitutional distinctions between "free" persons and persons "held to service or labour." U.S. CONST. arts. I, § 2 & IV, § 2.[3]

Although the constitution did not establish or legalize slavery, it certainly recognized its existence within the states which tolerated it. *See The Amistad,* 40 U.S. 518, 551, 15 Pet. 518, 10 L.Ed. 826 (1841). This constitutional recognition of slavery undoubtedly facilitated a union of the original colonies, but it postponed until a later day a resolution of the tension between involuntary servitude and the concept of equal protection of laws implied by the Fifth Amendment.[4] Reconciling the institution of slavery with the notion of equal protection ultimately proved to be impossible. In the end, a constitutional "clarification" was obtained by the force of arms, six hundred thousand lives, and two constitutional amendments.

In 1863, while the outcome of the civil war remained very much in doubt, President Lincoln issued his Emancipation Proclamation purporting to free slaves found within the confederate states. In 1865, just months after general hostilities had ended, the Thirteenth Amendment was adopted. It declared that "neither slavery nor involuntary servitude ... shall exist within the United States, or any place subject to their jurisdiction." U.S. CONST. amend. XIII, § 1. The abolition of slavery, however, was not immediately effective in bestowing the equal protection of law upon all persons. Several centuries of slavery had instilled a deep cultural bias against people of color. Individual southern states began enacting the so-called Black Codes which were designed to repress their black citizens and very nearly resurrect the institution of slavery. *City of Memphis v. Greene,* 451 U.S. 100, 132, 101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (White, J., concurring). In response to these events, the Republican Congress passed the Civil Rights Act of 1866 in an attempt to ensure equal rights for former slaves. *General Bldgs. Contrs. Assn., Inc. v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In 1868, the Fourteenth Amendment was adopted and its Equal Protection Clause enjoined the states from denying to any person the equal protection of the laws.

Thus, the central purpose of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno,* 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). While the guarantees of "equal protection" and "due pro-

---

Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

TEX. CONST. art. I, § 3a.

**3.** These articles were subsequently amended by the Thirteenth and Fourteenth Amendments.

**4.** The Due Process Clause of the Fifth Amendment "requires that every man shall have the protection of his day in court, and the benefit of the general law ... so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." U.S. CONST. amend. V.

cess of law" may overlap, the spheres of protection they offer are not coterminous. *Truax,* 257 U.S. at 332, 42 S.Ct. at 129. Rather, the right to " 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law.' " *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). It is aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality, on the other. *See Truax,* 257 U.S. at 332–33, 42 S.Ct. at 129. It was not intended, however, "to interfere with the power of the state . . . to prescribe regulations to promote the health, peace, morals, education, and good order of the people." *Barbier v. Connolly,* 113 U.S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923 (1884).

Similarly, Article I, § 3 of the Texas Constitution also guarantees equality of rights to all persons. *Burroughs v. Lyles,* 142 Tex. 704, 181 S.W.2d 570, 574 (1944). It was designed to prevent any person, or class of persons, from being singled out as a special subject for discriminating or hostile legislation. *Id.* Because the state and federal equal protection guarantees share a common aim and are similar in scope, Texas cases have frequently followed federal precedent when analyzing the scope and effect of Article I, § 3. *Hogan v. Hallman,* 889 S.W.2d 332, 338 (Tex.App.— Houston [14th Dist.] 1994, writ denied).

The Texas Equal Rights Amendment, however, has no federal equivalent. *See* Tex. Const. art. I, § 3a. When Texas voters adopted it in 1972 by a four to one margin, both the United States and Texas constitutions already provided due process and equal protection guarantees. *In the Interest of McLean,* 725 S.W.2d 696, 698 (Tex.1987). Thus, unless the amendment was an exercise in futility, it must have been intended to be more extensive and provide greater specific protection than either the United States or Texas due process and equal protection guarantees. *Id.*

All of the aforementioned state and federal guarantees of equal protection are tempered somewhat by the practical reality that the mere act of governing often requires discrimination between groups and classes of individuals. *Casarez v. State,* 913 S.W.2d 468, 493 (Tex.Crim.App. 1994). A state simply cannot function without classifying its citizens for various purposes and treating some differently than others. *See Sullivan v. U.I.L.,* 616 S.W.2d 170, 172 (Tex.1981). For example, able-bodied citizens may be required to serve in the armed forces, while the infirm are not. *Casarez,* 913 S.W.2d at 493.

■ The conflict between the hypothetical ideal of equal protection and the practical necessity of governmental classifications has spawned a series of judicial tests for determining when classifications are and are not permissible. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The general rule gives way, however, when a statute classifies persons by race, alienage, or national origin. *Id.* These factors are so seldom relevant to the achievement of any legitimate state interest that laws separating persons according to these "suspect classifications" are subject to strict scrutiny. *Id.* Accordingly, laws directed against a "suspect class," or which infringe upon a "fundamental right," will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.; Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988).

### *Sexual Orientation*

■ Relying on the Fourteenth Amendment of the United States Constitution, Article I, § 3 of the Texas Constitution, and the Texas Equal Rights Amendment, appellants contend that Section 21.06 of the Texas Penal Code unconstitutionally discriminates against homosexuals.[5] In other words, the statute improperly punishes persons on the basis of their sexual orientation.

The threshold issue we must decide is whether Section 21.06 distinguishes persons by sexual orientation. On its face, the statute makes no classification on the basis of sexual orientation; rather, the statute is expressly directed at conduct. While homosexuals may be disproportionately affected by the statute, we cannot assume homosexual conduct is limited only to those possessing a homosexual "orientation." Persons having a predominately heterosexual inclination may sometimes engage in homosexual conduct.[6] Thus, the statute's proscription applies, facially at least, without respect to a defendant's sexual orientation.

■ However, a facially neutral statute may support an equal protection claim where it is motivated by discriminatory animus and its application results in a discriminatory effect. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Appellants contend this discriminatory intent is evident in the evolution of Section 21.06. For most of its history, Texas has deemed deviate sexual intercourse, i.e., sodomy, to be unlawful whether performed by persons of the same or different sex.[7] In 1973, however, the Legislature repealed its prohibition of sodomy generally, except when performed by persons of the same sex. Because "homosexual sodomy" is unlawful, while "heterosexual sodomy" is not, appellants contend the statute evidences a hostility toward homosexuals, not shared by heterosexuals.

While we find this distinction may be sufficient to support an equal protection claim, neither the United States Supreme Court, the Texas Supreme Court, nor the Texas Court of Criminal Appeals has found sexual orientation to be a "suspect

---

**5.** There is some authority recognizing a distinction between homosexual orientation and homosexual conduct. *Meinhold v. United States Dept. of Defense*, 34 F.3d 1469, 1477 (9th Cir.1994); *Pruitt v. Cheney*, 963 F.2d 1160, 1164 (9th Cir.1991); *see also Watkins v. United States Army*, 875 F.2d 699, 725 (9th Cir.1989) (Norris, J., concurring) (stating that "any attempt to criminalize the status of an individual's sexual orientation would present grave constitutional problems").

**6.** In his study of human sexuality, Dr. Alfred C. Kinsey classified the "sexual orientation" of his subjects on a seven point continuum: (1) exclusively heterosexual; (2) predominantly heterosexual, only incidentally homosexual; (3) heterosexual, but more than incidentally homosexual; (4) equally heterosexual and homosexual; (5) predominantly homosexual, but more than incidentally heterosexual; (6)

predominantly homosexual, but incidentally heterosexual; and (7) exclusively homosexual. Jeffrey S. Davis, *Military Policy Toward Homosexuals: Scientific, Historical, and Legal Perspectives*, 131 MIL. L.REV. 55, 58 (1991). Kinsey estimated that approximately 50 per cent of the population is exclusively heterosexual; 4 per cent is exclusively homosexual. *Id.* at 64. *See also* Sharon Elizabeth Rush, *Equal Protection Analogies—Identity and "Passing": Race and Sexual Orientation*, 13 HARV. BLACKLETTER J. 65, 83–84 (1997); Odeana R. Neal, *The Limits of Legal Discourse: Learning From the Civil Rights Movement in the Quest for Gay and Lesbian Civil Rights*, 40 N.Y.L. SCH. L.REV. 679, 705 (1996).

**7.** *See* Acts 1943, 48th Leg., p. 194, ch.112, § 1; Vernon's Ann. P.C. (1925) art. 524; Rev. P.C.1911, art. 507; Rev. P.C. 1895, art. 364; and Rev.P.C.1879, art. 342.

class." [8] Thus, the prohibition of homosexual sodomy is permissible if it is rationally related to a legitimate state interest.

The State contends the statute advances a legitimate state interest, namely, preserving public morals. One fundamental purpose of government is "to conserve the moral forces of society." *Grigsby v. Reib*, 105 Tex. 597, 607, 153 S.W. 1124, 1129 (Tex.1913). In fact, the Legislature has outlawed behavior ranging from murder to prostitution precisely because it has deemed these activities to be immoral. Even our civil law rests on concepts of fairness derived from a moral understanding of right and wrong. The State's power to preserve and protect morality has been the basis for upholding such diverse statutes as requiring parents to provide medical care to their children,[9] prohibiting the sale of obscene devices,[10] forbidding nude dancing where liquor is sold,[11] criminalizing child endangerment,[12] regulating the sale of liquor,[13] and punishing incest.[14] Most, if not all, of our law is "based on notions of morality." *Bowers v. Hardwick*, 478 U.S. 186, 196, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

Appellants claim the concept of "morality" is simply "the singling out [of] groups of people based on popular dislike or disapproval." Contending this practice was specifically condemned in *Romer v. Evans*, appellants argue that classifications based on sexual orientation can no longer be rationally justified by the State's interest in protecting morality. 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). We find, however, that appellant's broad interpretation of *Romer* is not supported by the text or rationale of the Court's opinion.

In *Romer*, the Supreme Court considered the constitutionality of Colorado's universal prohibition of any statute, regulation, ordinance, or policy making homosexual orientation the basis of any claim of minority status, quota preferences, protected status, or claim of discrimination. Justice Kennedy, writing for the majority, first observed that the Fourteenth Amendment does not give Congress a general power to prohibit discrimination in public accommodations. *Id.* at 627–28, 116 S.Ct. 1620. Thus, discrimination in employ-

**8.** The Ninth Circuit Court of Appeals briefly held that homosexuals constitute a "suspect class," but that opinion was later withdrawn. *Watkins v. United States Army*, 847 F.2d 1329, 1349 (9th Cir.1988), *withdrawn*, 875 F.2d 699, 711 (9th Cir.1989), *cert. denied*, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990). No other federal court of appeals has ever applied heightened scrutiny when considering equal protection claims in the context of sexual orientation. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir.1989); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir.1989); *Padula v. Webster*, 822 F.2d 97, 103 (D.C.Cir.1987) (all holding that homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes). *See also Romer v. Evans*, 517 U.S. 620, 631–32, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (relying on the "rational relationship" test

rather than "strict scrutiny" when assessing the constitutionality of Colorado's Second Amendment barring legislation favorable to homosexuals).

**9.** *Commonwealth v. Nixon*, 563 Pa. 425, 761 A.2d 1151, 1156 (2000).

**10.** *Yorko v. State*, 690 S.W.2d 260, 265–66 (Tex.Crim.App.1985).

**11.** *El Marocco Club, Inc. v. Richardson*, 746 A.2d 1228, 1237–38 (R.I.2000).

**12.** *State v. Wilson*, 267 Kan. 550, 987 P.2d 1060, 1067 (1999).

**13.** *Altshuler v. Pennsylvania Liquor Control Bd.*, 729 A.2d 1272, 1277 (Pa.Cmwlth.1999).

**14.** *Smith v. State*, 6 S.W.3d 512, 519–20 (Tenn.Crim.App.1999).

ment, accommodations, and other commercial activities has historically been rectified by the enactment of detailed statutory schemes. *Id.* at 628, 116 S.Ct. 1620. The Court cited, for illustration, several municipal codes in Colorado that prohibited discrimination on the basis of age, military status, pregnancy, parenthood, custody of a minor child, political affiliation, physical or mental disability, or sexual orientation. *Id.* at 629, 116 S.Ct. 1620. To the extent these codes protected homosexuals, however, they were rendered invalid by Colorado's constitutional amendment.

In striking down the amendment, the Supreme Court declared that all citizens have the right to petition and seek legislative protection from their government. "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id.* at 633, 116 S.Ct. 1620. "A State cannot ... deem a class of persons a stranger to its laws." *Id.* at 635, 116 S.Ct. 1620. Thus, while no individual, class, or group is guaranteed success, all persons

have the right to *seek* legislation favoring their interests.

Here, appellants do not suggest that Section 21.06 unconstitutionally encumbers their right to seek legislative protection from discriminatory practices. Hence, *Romer* provides no support for appellants' position. *Romer,* for example, does not disavow the Court's previous holding in *Bowers;* it does not elevate homosexuals to a suspect class; it does not suggest that statutes prohibiting homosexual conduct violate the Equal Protection Clause; and it does not challenge the concept that the preservation and protection of morality is a legitimate state interest.[15]

Moreover, while appellants may deem the statute to be based on prejudice, rather than moral insight, our power to review the moral justification for a legislative act is extremely limited. The constitution has vested the legislature, not the judiciary, with the authority to make law. In so doing, the people have granted the legislature the exclusive right to determine issues of public morality.[16] If a court could

---

**15.** In fact, the State of Colorado did not cite the preservation of morality as one of its legitimate interests in attempting to uphold the amendment. Rather, the state argued that it had a legitimate interest in: (1) protecting the freedom of association of its citizens, particularly those who might have personal or religious objections to homosexuality, and (2) conserving its resources to combat discrimination against other groups. *Id.* at 635, 116 S.Ct. 1620.

**16.** Where a statute does not run afoul of explicit constitutional protections, its moral justification is virtually unreviewable by the judiciary. When the rational basis for an Alabama statute outlawing certain sexual devices was challenged, the United States Eleventh Circuit Court of Appeals wrote:

> However misguided the legislature of Alabama may have been in enacting the statute challenged in this case, the statute is not constitutionally irrational under rational

basis scrutiny because it is rationally related to the State's legitimate power to protect its view of public morality. "The Constitution presumes that ... improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–943, 59 L.Ed.2d 171 (1979). This Court does not invalidate bad or foolish policies, only unconstitutional ones; we may not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

For the foregoing reasons, we hold the Alabama statute challenged in this case has a rational basis.

overturn a statute because it perceived nothing wrong with the prohibited conduct, the judiciary would at once become the rule making authority for society—this the people have strictly forbidden. Accordingly, we must assume for the purposes of our analysis that the Legislature has found homosexual sodomy to be immoral.

The State also contends the legislature could have rationally concluded that "homosexual sodomy" is a different, and more reprehensible, offense than "heterosexual sodomy." This proposition is difficult to confirm because in American jurisprudence courts and legislatures have historically discussed the topic only in terms of vague euphemisms. In fact, statutes often made sodomy a criminal offense without ever defining the conduct. *See Commonwealth v. Poindexter*, 133 Ky. 720, 118 S.W. 943, 944 (1909).

In its broadest common law form, the offense "consists in a carnal knowledge committed against the order of nature by man with man, or in the same unnatural manner with woman; or by man or woman, in any manner, with beast." *Prindle v. State*, 31 Tex.Crim. 551, 21 S.W. 360 (1893). More restrictive definitions of sodomy, however, were commonly recognized. In many instances, for example, sodomy was restricted to carnal copulation between two human beings—sometimes further restricted to males (perhaps because it was difficult to "imagine that such an offense would ever be committed between a man and a woman"). *Wise v. Commonwealth*, 135 Va. 757, 115 S.E. 508, 509 (1923). In any· event, only homosexual

conduct between *two men* was included among the early capital crimes of the Massachusetts Bay Colony.[17] Moreover, in some jurisdictions, including Texas, sodomy did not include oral sex. *Prindle*, 21 S.W. at 360; *Poindexter*, 118 S.W. at 944. Again, it is difficult to know whether this more narrow definition arose deliberately or was simply the product of legislative ignorance and/or judicial innocence. Conceivably, oral sex was "so unusual and unthinkable as perhaps not to have been even contemplated in the earlier stages of the law." *Wise*, 115 S.E. at 509.

 Regardless of how these differing definitions of sodomy arose, we agree with the State's general contention that it has always been the legislature's prerogative to deem some acts more egregious than others. For example, the legislature has not chosen to make every homicide a capital offense; depending upon the circumstances, some homicides are first degree felonies,[18] some are second degree felonies,[19] some are state jail felonies,[20] and others are lawful.[21] Moreover, it is the duty of this Court to construe every statute in a manner that renders it constitutional if it is possible to do so consistent with a reasonable interpretation of its language. *Trinity River Authority v. URS Consultants, Inc. Texas*, 869 S.W.2d 367, 370 (Tex.App.—Dallas 1993), *aff'd*, 889 S.W.2d 259 (Tex.1994). Accordingly, we find the legislature could have concluded that deviant sexual intercourse, when performed by members of the same sex, is an act different from or more offensive than

---

*Williams v. Pryor*, 229 F.3d 1331, 1339 (11th Cir.2000).

**17.** Bestiality, however, was a capital offense whether committed by a man or a woman. THE LAWS AND LIBERTIES OF MASSACHUSETTS, at 5 (Cambridge 1648).

**18.** TEX. PEN.CODE ANN. § 19.02 (Vernon 1994).

**19.** TEX. PEN.CODE ANN. § 19.04 (Vernon 1994).

**20.** TEX. PEN.CODE ANN. § 19.05 (Vernon 1994).

**21.** TEX. PEN.CODE ANN. §§ 9.32, 9.33, 9.42, & 9.43 (Vernon 1994)

any such conduct performed by members of the opposite sex.

Because (1) there is no fundamental right to engage in sodomy, (2) homosexuals do not constitute a "suspect class," and (3) the prohibition of homosexual conduct advances a legitimate state interest and is rationally related thereto, namely, preserving public morals, appellant's first contention is overruled.

### Gender

■ Appellants also contend Section 21.06 unconstitutionally discriminates on the basis of gender. In Texas, gender is recognized as a "suspect class." *Barber v. Colorado Independent School Dist.,* 901 S.W.2d 447, 452 (Tex.1995). In light of the Texas Equal Rights Amendment, classifications by gender are subject to "strict scrutiny" and will be upheld only if the State can show such classifications have been suitably tailored to serve a compelling state interest.[22]

■ Appellants claim Section 21.06 discriminates on the basis of sex because criminal conduct is determined to some degree by the gender of the actors. For example, deviate sexual intercourse is not unlawful *per se* in Texas. While the physical act is not unlawful as between a man and woman, it is unlawful when performed between two men or two women. Appellants contend that because criminality under the statute is, in some respects, gender-dependent, Section 21.06 runs afoul of state and federal equal protection guarantees.

The State asserts the statute applies equally to men and women, i.e., two men engaged in homosexual conduct face the same sanctions as two women. Thus, the State maintains the statute does not discriminate on the basis of gender. Appellants respond by observing that a similar rationale was expressly rejected in the context of racial discrimination. *Loving v. Virginia,* 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

In *Loving,* the State of Virginia attempted to uphold its miscegenation statute in the face of an equal protection challenge by arguing that the statute did not discriminate on the basis of race because it applied equally to whites and blacks. The Supreme Court traced the origins of Virginia's miscegenation statute and concluded that "[p]enalties for miscegenation arose as an incident to slavery." *Loving,* 388 U.S. at 6, 87 S.Ct. 1817. Because the clear and central purpose of the Fourteenth Amendment was "to eliminate all official state sources of invidious racial discrimination," the court determined the statute was unconstitutional. *Id.,* at 10, 87 S.Ct. 1817.

Here, the State of Texas employs a comparable argument, namely, Section 21.06 does not discriminate on the basis of gender because it applies equally to men and women. Appellants' contend the argument was discredited by *Loving* and should not be followed here. But while the purpose of Virginia's miscegenation statute was to segregate the races and perpetuate the notion that blacks are inferior to whites, no such sinister motive can be ascribed to the criminalization of homosexual conduct. In other words, we find

---

**22.** Under the Fourteenth Amendment, gender classifications are analyzed according to an intermediate "heightened scrutiny" falling somewhere between the rational relationship test and strict scrutiny. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *see also*

*Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (holding that under the Fourteenth Amendment, classifications by gender must serve important governmental objectives and must be substantially related to the achievement of those objectives).

nothing in the history of Section 21.06 to suggest it was intended to promote any hostility between the sexes, preserve any unequal treatment as between men and women, or perpetuate any societal or cultural bias with regard to gender. Thus, we find appellants' reliance on *Loving* unpersuasive.[23]

While Section 21.06 alludes to sex, not every statutory reference to gender constitutes an unlawful "gender-classification." Texas law provides, for example, that counties are authorized to increase participation by *"women-owned* businesses" in public contract awards by establishing a contract percentage goal for those businesses;[24] when jurors are sequestered overnight, separate facilities must be provided for *male* and *female* jurors;[25] employers are prohibited from permitting, requesting, or requiring *female* children to work topless;[26] the Director of the Texas Department of Transportation must report to each house of the legislature regarding the department's progress in recruiting and hiring *women*;[27] where a child is adopted by two parents, one must be *female* and the other *male*;[28] *female* patients being transported from a jail to a mental health facility must be accompanied by a *female* attendant;[29] circumcision of a *female* under the age of 18 is unlawful;[30] etc. Whether these and many other gender-specific statutes, violate the Texas Equal Rights Amendment is not before us. We must assume, however, that the legislature enacted these provisions with full knowledge of Article I,

---

**23.** *See also Boutwell v. State,* 719 S.W.2d 164 (Tex.Crim.App.1985). There the Court of Criminal Appeals considered the applicability of the Texas Equal Rights Amendment to Section 21.10 of the Penal Code which, until its repeal in 1983, provided legal defenses to certain heterosexual acts that were specifically denied in the context of homosexual acts. Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 21.10, 1973 Tex. Gen. Laws 918. When Boutwell was charged with sexual abuse of several boys, he argued the statute was unconstitutional under the Texas Equal Rights Amendment because it discriminated against him on the basis of sex. *Boutwell,* 719 S.W.2d at 167. The Court of Criminal Appeals rejected the contention, stating:

> But clearly, a female defendant situated similarly to appellant—that is, a female who had engaged in deviate sexual intercourse with a child 14 years or older who was of the same sex—would likewise be denied the "promiscuity" defense under § 21.10. Thus, appellant's reasoning proceeds upon a fallacy of amphiboly: his complaint is not that he is discriminated against on the basis of "sex" in the sense of "gender;" but rather, that his "sex" *act* is entitled to protection equal to that given heterosexual conduct under the law as stated in § 21.10(b).

*Id.* at 169; *see also Boulding v. State,* 719 S.W.2d 333 (Tex.Crim.App.1986).

*Boutwell* has been severely criticized, but on grounds different than those at issue here. *McGlothlin v. State,* 848 S.W.2d 139, 140–141 (Tex.Crim.App.1992); *Vernon v. State,* 841 S.W.2d 407, 410 (Tex.Crim.App.1992).

**24.** TEX. LOC. GOV'T.CODE ANN. § 381.004 (Vernon 1999).

**25.** TEX.CODE CRIM. PROC. ANN. art. 35.23 (Vernon Supp.2000).

**26.** TEX. PEN.CODE ANN. § 43.251 (Vernon 1994).

**27.** TEX. TRANS. CODE ANN. § 201.403 (Vernon 1999).

**28.** TEX. HEALTH & SAFETY CODE ANN. § 192.008 (Vernon Supp.2000).

**29.** TEX.CODE CRIM. PROC. ANN. art. 46.04 (Vernon Pamph.2000).

**30.** TEX. HEALTH & SAFETY CODE ANN. § 166.001 (Vernon Supp.2000).

The legislature has mistakenly designated two different statutes as Section 166.001 of the Health and Safety Code. Act of May 18, 1999, 76th Leg., R.S., ch. 450, § 1.02, 1999 Tex. Gen. Laws 2835 (Advance Directives Act) and Act of May 26, 1999, 76th Leg., R.S., ch. 642, § 1, 1999 Tex. Gen. Laws 3213 (Female Genital Mutilation Prohibited).

section 3a of the Texas Constitution and perceived no conflict. The legislature, for example, has specifically admonished the governor and supreme court to ensure the full and fair representation of women when making their appointments to the Board of Directors of the State Bar of Texas, but to also make no "regard to race, creed, sex, religion, or national origin." TEX. GOV'T CODE ANN. § 81.020 (Vernon 1998).

The mere allusion to gender is not a talisman of constitutional invalidity. If a statute does not impose burdens or benefits upon a particular gender, it does not subject individuals to unequal treatment. *See Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 702 (9th Cir.1997) (holding that while California's Proposition 209 mentions race and gender, it does not logically classify persons by race and gender); *see also Hayden v. County of Nassau,* 180 F.3d 42, 48–49 (2nd Cir.1999) (entrance exam designed to diminish cultural bias on black applicants did not constitute a "racial classification" because it did not promote one race over another). While Section 21.06 includes the word "sex," it does not elevate one gender over the other. Neither does it impose burdens on one gender not shared by the other.

Where, as here, a statute is gender-neutral on its face, appellants bear the burden of showing the statute has had an adverse effect upon one gender and that such disproportionate impact can be traced to a discriminatory purpose. *Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 819 (4th Cir.1995); *Keevan v. Smith,* 100 F.3d 644, 650 (8th Cir.1996). Appellants have made no attempt to establish, nor do they even contend, that Section 21.06 has had any disparate impact between men and women. Rather, appellants complain only that the statute has had a disparate impact between homosexu-

als and heterosexuals. While we recognize the statute may adversely affect the conduct of male and female homosexuals, this simply does not raise the specter of gender-based discrimination.

As we already have determined, the police power of a state may be legitimately exerted in the form of legislation where such statute bears a real and substantial relation to the public health, safety, morals; or some other phase of the general welfare. *Louis K. Liggett Co. v. Baldridge,* 278 U.S. 105, 111–12, 49 S.Ct. 57, 73 L.Ed. 204 (1928). To the extent the statute has a disproportionate impact upon homosexual conduct, the statute is supported by a legitimate state interest. The first point of error is overruled.

### PRIVACY

█ In their second point of error, appellants contend Section 21.06 violates the right to privacy guaranteed by both the state and federal constitutions. Appellants claim the intimate nature of the conduct at issue, when engaged in by consenting adults in private, is beyond the scope of governmental interference.

Neither the state nor federal constitutions contain an explicit guarantee of privacy. Thus, there is no general constitutional right to privacy. However, both constitutions contain express limitations on governmental power from which "zones of privacy" may be inferred. The United States Supreme Court has found five such zones in the Bill of Rights:

Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment.... The Third Amendment in its prohibition against the quartering of soldiers "in any house" in time of peace without the consent of the owner is another facet of that privacy. The Fourth Amendment explicitly affirms the "right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

*Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

Similarly, the Texas Supreme Court has found "constitutionally protected zones of privacy emanating from several sections of article I of the Texas Constitution." *City of Sherman v. Henry,* 928 S.W.2d 464, 472 (Tex.1996). These include: section 6, concerning freedom of worship; section 8, concerning freedom of speech and press; section 9, concerning searches and seizures; section 10, concerning the rights of an accused in criminal prosecutions; section 19, concerning deprivation of life, liberty and property, and due course of law; and section 25, concerning quartering soldiers in houses. *Id.*

Appellants do not specifically identify the constitutional provision which they claim creates a zone of privacy protecting consensual sexual behavior from state interference. However, we find there are but two provisions of the federal constitution which could arguably be construed to apply here—the Fourth and Ninth Amendments.

The Fourth Amendment is not applicable because appellants do not contest, and have never contested, the entry by police into the residence where they were discovered. Thus, we must assume the police conduct was both reasonable and lawful under the Fourth Amendment.

The Ninth Amendment also offers no support. In *Bowers v. Hardwick,* the defendants were convicted of violating the Georgia sodomy statute. 478 U.S. at 190–91, 106 S.Ct. 2841. Relying upon *Griswold v. Connecticut*[31] and other decisions recognizing "reproductive rights," the defendants argued that the Ninth Amendment creates a zone of privacy regarding consensual sexual activity that encompasses homosexual sodomy. The court rejected the argument and said "the position that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable." *Bowers,* 478 U.S. at 191, 106 S.Ct. 2841.

Likewise, under the Texas Constitution, we perceive that there are but two provisions that would arguably support appellants' position—sections 9 and 19 of Article I. Again, because appellants have not challenged the search leading to their arrest, we must conclude the police did not violate section 9 of the Texas Constitution.

Although neither the Texas Supreme Court nor Texas Court of Criminal Appeals has considered whether section 19 creates a zone of privacy that would protect private homosexual behavior, the Supreme Court has held it does not protect private *heterosexual* behavior. In *City of Sherman v. Henry,* the court was confronted with a case where the city had denied a promotion to a police officer because he was having an adulterous affair with the wife of another officer. *See Henry* 928 S.W.2d at 465. The court held that Article I, section 19 does not create a right of privacy protecting adulterous conduct without state interference.

---

**31.** 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

[S]exual relations with the spouse of another is not a right that is "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition." Prohibitions against adultery have ancient roots. In the latter half of the 17th century in England, adultery was a capital offense. 4 WILLIAM BLACKSTONE, COMMENTARIES *64. The common law brought to this country by the American colonists included the crime of adultery as previously defined by the canon law of England. *United States v. Clapox*, 35 F. 575, 578 (D.Or. 1888); FRANCIS WHARTON, A TREATISE ON CRIMINAL LAW vol. 11, §§ 1719–20, p. 524 (9th ed. 1885). Adultery was still considered a crime by courts and commentators in the latter half of the 19th century when the Fourteenth Amendment was ratified. *See Clapox*, 35 F. at 578; WHARTON, *supra*. In fact, adultery is a crime today in half of the states and the District of Columbia.

* * *

While other states, including Texas, have recently repealed laws criminalizing adultery, the mere fact that such conduct is no longer illegal in some states does not cloak it with constitutional protection.

*Id.* at 470.

Similarly, we find homosexual conduct is not a right that is "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history and tradition." In America, homosexual conduct was classified as a felony offense from the time of early colonization.[32] In fact, there was such unanimity of condemnation that sodomy was, before 1961, a criminal offense in all fifty states and the District of Columbia. *Bowers v. Hardwick*, 478 U.S. at 193, 106 S.Ct. 2841. In Texas, homosexual conduct has been a criminal offense for well over a century.[33]

In addition to an American tradition of statutory proscription, homosexual conduct has historically been repudiated by many religious faiths.[34] Moreover, Western civilization has a long history of repressing homosexual behavior by state action. Under Roman law, Justinian states that a *lex Iulia* imposed severe criminal penalties against "those who indulge in criminal intercourse with those of their own sex."[35] Blackstone states that the "infamous crime against nature, committed either with man or beast" was a grave offense among the ancient Goths and that it continued to be so under English common law at the time of his writing.[36] In his survey of the law, Montesquieu was prompted to conclude that "the crime against nature" is a "crime, which religion, morality, and civil government equally condemn."[37]

---

32. *See* LAWS AND LIBERTIES 5 (Cambridge 1648) (collection of the general laws of the Massachusetts Bay Colony).

33. *See* Tex. Penal Code art. 342 (1879); Tex. Penal Code art. 364 (1895); Tex. Penal Code art. 507 (1911); and Tex. Penal Code art. 524 (1925).

34. "Our society's three major religions—Judaism, Christianity, and Islam—historically have viewed homosexuality as immoral." Richard F. Duncan, *Who Wants to Stop the Church: Homosexual Rights Legislation, Public Policy, and Religious Freedom*, 69 NOTRE DAME L.REV. 393, 404 n. 40 (1994) [citing The Jewish Torah (Leviticus 18:22, 20:13), the New Testament (Romans 1:26–28, I Timothy 1:9–10, I Corinthians 6:9–10) and the Koran (The Heights 7:80) ].

35. FLAVIUS JUSTINIAN, THE INSTITUTES OF JUSTINIAN 205 (J.B. Moyle trans., 5th ed., Oxford 1913).

36. 4 WILLIAM BLACKSTONE, COMMENTARIES *215–16.

37. 1 BARON DE MONTESQUIEU, THE SPIRIT OF LAWS 231 (Dublin 1751).

Nevertheless, appellants contend that Texas should join several of our sister states who have legalized homosexual conduct. Certainly, the modern national trend has been to decriminalize many forms of consensual sexual conduct even when such behavior is widely perceived to be destructive and immoral, e.g., seduction, fornication, adultery, bestiality, etc.[38] Our concern, however, cannot be with cultural trends and political movements because these can have no place in our decision without usurping the role of the Legislature. While the Legislature is not infallible in its moral and ethical judgments, it alone is constitutionally empowered to decide which evils it will restrain when enacting laws for the public good.[39]

Our role was aptly defined over a hundred years ago by Justice Noggle who, while writing for the Idaho Supreme Court, observed: "The court is not expected to make or change the law, but to construe it, and determine the power of the law and the power the legislature had to pass such a law; whether that power was wisely or unwisely exercised, can be of no consequence." *People v. Griffin,* 1 Idaho 476, 479 (1873). Because we find no constitutional "zone of privacy" shielding homosexual conduct from state interference, appellants' second point of error is overruled.

The judgment of the trial court is affirmed.

Justices YATES, FOWLER, EDELMAN, WITTIG, FROST, and MAURICE E. AMIDEI join this opinion.

---

**38.** Despite this trend, there are still today many types of "private" conduct which courts have recognized are not protected from state interference. *See generally Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (holding there is no protected right to commit suicide); *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (possession of child pornography not a protectable privacy interest even when possessed inside the home); *Bowers,* 478 U.S. at 195, 106 S.Ct. 2841 (suggesting that adultery, even when committed in the home, is not a constitutionally protected behavior); *United States v. Miller,* 776 F.2d 978 (11th Cir.1985) (holding that constitutional right of privacy does not shield a person from personal possession of pornography outside the home); *Potter v. Murray City,* 760 F.2d 1065 (10th Cir.1985) (holding that because monogamy is inextricably woven into the fabric of our society, ban on plural marriage did not violate right of privacy); *United States v. Fogarty,* 692 F.2d 542 (8th Cir.1982) (holding there is no fundamental right to possess marijuana); *J.B.K., Inc. v. Caron,* 600 F.2d 710 (8th Cir.1979) (holding right of privacy does not extend to commercialized sexual activities); *Kuromiya v. United States,* 37 F.Supp.2d 717 (E.D.Pa.1999) (holding there is no fundamental right to smoke marijuana).

**39.** The fact that unlawful behavior is conducted in private between consenting adults may complicate detection and prosecution, but it does not, *ipso facto,* render its statutory prohibition unconstitutional. In upholding its sodomy statute, the Supreme Court of Louisiana wrote:

> The question of whether or not a third party is harmed by a consensual and private act of oral or anal sex is a debate which has been ongoing for many years and is nothing which this court needs to address. The legislature is within constitutional authority to proscribe its commission. Any claim that private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable.
>
> * * *
>
> There has never been any doubt that the legislature, in the exercise of its police power, has authority to criminalize the commission of acts which, without regard to the infliction of any other injury, are considered immoral.
>
> Simply put, commission of what the legislature determines as an immoral act, even if consensual and private, is an injury against society itself.

*See State v. Smith,* 766 So.2d 501, 509 (La. 2000).

Justice YATES also filed a concurring opinion in which Justices HUDSON, FOWLER, EDELMAN, and FROST join.

Justice FOWLER also filed a concurring opinion in which Justices YATES, EDELMAN, FROST, and MAURICE E. AMIDEI join.

Justice ANDERSON filed a dissenting opinion in which Senior Chief Justice MURPHY Joins.[*]

YATES, Justice, concurring.

I agree with the result reached by, and reasoning utilized by, the majority opinion. However, I write separately only to address one of the arguments raised by amicus curiae. Amicus curiae alleges that by overruling the prior panel's decision, this Court will have succumbed to improper political pressure and asserts "[t]he best way for this Court to rebuke those who attempted to exercise improper political influence in the present case is to affirm the well-reasoned panel opinion."

The Texas Code of Judicial Conduct provides the guiding principals for every judge of this State in the performance of his or her judicial duties. TEX.CODE JUD. CONDUCT, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. B (Vernon 1998 & Supp.2000). Each judge in Texas is instructed to "not be swayed by partisan interests, public clamor, or fear of criticism." *Id.* at Canon 3(B)(2). What amicus curiae requests this Court to do is, in effect, no different from what those who leveled political attacks against the majority in the panel opinion hoped to achieve, *i.e.,* a certain desired result.[1] In other words, amicus curiae asks this Court to shirk its bound duty in order to decide a

difficult question of law differently from what it believes to be the correct resolution. Amicus curiae's request is grounded on the mistaken notion that any different result must surely be on the basis of political pressure, without crediting the members of this Court with the integrity to carry out their duties in strict accordance with the Texas Code of Judicial Conduct and with careful consideration of the legal issues presented in this appeal. As amicus curiae suggests, attacks on the judiciary, like the one following the panel opinion, may have the effect of increasing the potential that the public's confidence in our courts will diminish because of a perception, however erroneous, that we have made a political decision, not a legal one. But the response to such a reckless and irresponsible act cannot be that we ignore our duty to decide the law we have been entrusted to interpret. Attempts to politicize this opinion—regardless of their origin—have no place in our decisionmaking process, nor are attacks from opposing interests immune from creating the very same perception in the mind of the public that may now exist as a result of earlier inappropriate attempts to influence this decision.

"Judges are called upon to make hundreds of decisions each year. These decisions are made after consideration of opposing contentions, both of which are often based on reasonable interpretations of the laws of the United States and the Constitution." *Second Circuit Chief Judges Criticize Attacks on Judge Baer,* 215 N.Y.L.J. 4 (March 29, 1996). Unless there is a basis for disqualification or recusal, all judges must decide the matter brought

---

[*] Senior Chief Justice Paul C. Murphy and Former Justice Maurice Amidei sitting by assignment.

**1.** In its brief to this Court, amicus curiae describes the political attacks as including a

"letter circulated by local [Republican party] officials in an attempt to influence the outcome of the case."

before them. TEX.CODE JUD. CONDUCT, Canon 3(B)(1); *Rogers v. Bradley,* 909 S.W.2d 872, 879 (Tex.1995) (Enoch, J., responding to Justice Gammage's declaration of recusal) (citing *Sun Oil Co. v. Whitaker,* 483 S.W.2d 808, 823–24 (Tex.1972)). As one jurist has commented with regard to our duty to decide difficult matters presented to us:

> All judges face the likelihood of being publicly criticized ... for decisions that they render. It goes with the territory. A judge's oath is to decide cases based on the law and the facts. . . .

Carl E. Stewart, *Contemporary Challenges to Judicial Independence,* 43 LOY. L.REV. 293, 306 (1997). There is simply no place for suggesting that the members of this Court are pandering to certain political groups or deciding a case as a means to achieve a politically desired end.[2] And to do so only adds unnecessarily to the already politically charged climate created by the people amicus curiae purports to condemn.

Today we have been called upon to decide whether section 21.06 of the Texas Penal Code lacks a rational basis or otherwise violates the constitutional right to privacy found in the constitutions of either Texas or the United States. We have done so—not because of political pressures, as amicus curiae has suggested, but despite them.

FOWLER, Justice, concurring.

Today the Court holds that section 21.06 of the Texas Penal Code is not unconstitutional. I join in the court's opinion, however I write separately to make the following comments.

First, once the decision is made that the classifications in section 21.06 are not gender based, the analysis is relatively straightforward. A gender-based classification would require a heightened scrutiny of section 21.06 because gender is a protected class. However, sexual preference has not been designated a protected class by the United States Supreme Court, the Texas Supreme Court, or the Texas Court of Criminal Appeals. *See* Majority Op. n. 8 *supra.* Consequently, in deciding whether 21.06 is constitutionally sound, we look only for a rational relationship between section 21.06 and the State's reasons for enacting it.[1]

The State argues that 21.06 is directly related to the legislature's right to legislate morality. The United States Supreme Court has held that it is within a State's legitimate police power to legislate on grounds of morality. *Bowers v. Hardwick,* 478 U.S. 186, 196, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Thus, we need only determine if section 21.06 is related "to the pursuit" of implementing morality.

The United States Circuit Court for the Fifth Circuit has already held that 21.06 concerns issues of morality. *Baker v. Wade,* 769 F.2d 289, 292 (5th Cir.1985). In reviewing section 21.06, that court held, "[i]n view of the strong objection to homo-

---

2. *See, e.g.,* Stephen B. Bright, *Policital Attacks on the Judiciary: Can Justice Be Done Amid Efforts to Intimidate and Remove Judges from Office for Unpopular Decisions?,* 72 N.Y.U.L.Rev. 308, 313 (1997) (observing that "[i]t is irresponsible for critics of the courts to argue that only results matter, without regard to the legal principles that govern judicial decisionmaking.").

1. The dissent argues that the rational relationship test we are to use here is a higher standard than the rational relationship test normally is; however, that distinction is not apparent in the case law, and the dissent does not point to any particular language that supports this argument.

sexual conduct, which has prevailed in Western culture for the past seven centuries, we cannot say that section 21.06 is 'totally unrelated to the pursuit of,' implementing morality, a permissible state goal." (internal citations omitted). That is the same justification upon which the majority relies to reach the conclusion that the Texas Legislature was exercising valid legislative powers in enacting section 21.06. I agree that the justification is legally sound. It is not our duty to assess the wisdom or desirability of the law, *see New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), nor does "[t]his court ... invalidate bad or foolish policies, only unconstitutional ones; we may not 'sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Id.* As the majority states, "our power to review the moral justification for a legislative act is extremely limited."

Secondly, I concur with the majority in its rationale and holdings as to both the Equal Protection and Privacy sections of the opinion. I would only add that, as to whether section 21.06 unconstitutionally discriminates on the basis of gender, it clearly does not. This is not merely because of the equal application of the statute to men and women, but because this statute does not contain a discriminatory classification based on gender.

The dissent contends that, like the statute struck down in *Loving v. Virginia,* this statute "equally punishes," in this case, based on gender classification, which makes the statute gender based. 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). That argument is creative, but misguided.

In *Loving,* the Court struck down a statute because the statute furthered a loathsome discrimination—racism that implied a "superior" white person marrying an "inferior" black person does so at the risk of both being punished. The *Loving* court correctly recognized that this was the kind of discriminatory law sought to be vanquished by the Fourteenth Amendment; one that advanced the fallacy of racial superiority. However, *Loving* is not on point in this case because section 21.06 does not advance the fallacy of gender superiority. It prohibits a same-sex sexual relationship. The fact that sexual orientation necessarily depends upon the sex of the parties does not mean that section 21.06 is the kind of statute that *discriminates* on the basis of gender. Gender is treated as an elevated class under the Fourteenth Amendment because this country saw a need to rid itself of outdated notions of a woman's inferiority to a man.[2] *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971); *Seidenberg v. McSorleys' Old Ale House, Inc.,* 317 F.Supp. 593 (S.D.N.Y.1970); *Sail'er Inn, Inc. v. Kirby,* 5 Cal.3d 1, 95 Cal.Rptr. 329, 485 P.2d 529 (1971). There is nothing in section 21.06 that furthers any unequal treatment between the sexes. The dissent's argument to the contrary is not a legally sustainable one.

Finally, I also take issue with the dissent's treatment of the majority's reliance on *Bowers v. Hardwick.* The dissent correctly points out that *Bowers v. Hardwick* deals with the Due Process Clause, while the majority's analysis depends upon the Equal Protection Clause of the Fourteenth Amendment. The dissent remarks that

---

**2.** As the majority stated, "neither the United States Supreme Court, the Texas Supreme Court, nor the Texas Court of Criminal Appeals has found sexual orientation to be a 'suspect class.' "

"[t]his blending of quite distinct elements of the Federal Constitution blunts the force of the majority's equal protection arguments." I disagree.

First, the dissent overlooks the fact that the ultimate analysis in both *Bowers* and this case turns on the application of the rational basis test. This test does not differ depending on whether it is applied in a "due process" or an "equal protection" context. The test remains the same: does the statute further some legitimate, articulated state purpose? *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 461–62, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (analyzing a Fourteenth Amendment Equal Protection claim based on whether the statute at issue had a "rational relation to a legitimate government objective ...."); *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563, (1955) (analyzing a Fourteenth Amendment Due Process claim under the rational basis test by stating, "... to be constitutional, [i]t is enough that there is an [issue] at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."); *see Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) (analyzing a Fifth Amendment Due Process claim using a rational basis test drawn from Equal Protection cases that stated the statute must be "rationally based and free from invidious discrimination ..."). *Bowers* holds that states are within the scope of legislative authority—and further a legitimate state purpose—when their legislatures base laws on concepts of morality. Therefore, the application of *Bowers* does not "blunt[ ] the force of the majority's equal protection arguments."

Secondly, the dissent charges that the majority merges *Bowers'* due process analysis with the equal protection issue in this case. That statement is incorrect. The majority cites *Bowers* only three times: (1) in reference to legislating on notions of morality; (2) in reference to the privacy issue; and (3) for the contention that sodomy was an offense in all fifty states and in the District of Columbia prior to 1961. The majority's analysis of whether section 21.06 should be subject to some level of heightened scrutiny in an equal protection analysis does not depend on the *Bowers* decision. The dissent's implication to the contrary is inaccurate.

ANDERSON, Justice, dissenting.

I respectfully dissent to the majority's Herculean effort to justify the discriminatory classification of section 21.06 of the Penal Code despite the clear prohibitions on such discrimination contained in the Equal Protection Clause of the United States Constitution and the Texas Equal Rights Amendment in the Bill of Rights of the Texas Constitution.

Appellants are before this court challenging the constitutionality of Texas Penal Code section 21.06. They bring four issues: (1) whether the statute violates the right to federal constitutional equal protection *as applied and on its face;* (2) whether the statute violates the right to state constitutional equal protection *as applied and on its face;* (3) whether the statute violates the appellants' right to privacy under the Texas Constitution; and (4) whether the statute violates the appellants' right to privacy under the United States Constitution.

I believe appellants' federal right to privacy challenge is controlled by the Supreme Court's determination in *Bowers v. Hardwick*. The Due Process Clause of the Federal Constitution does not confer a fundamental right upon homosexuals to engage in sodomy. 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). I would reach the same conclusion on appel-

lants' privacy claim under the Texas Constitution. The Texas Supreme Court, borrowing heavily from *Bowers,* denied the existence of an asserted privacy right by insisting that adultery is "not a right implicit in the concept of liberty in Texas or deeply rooted in this state's history and tradition." *City of Sherman v. Henry,* 928 S.W.2d 464, 470 (Tex.1996). "Because homosexual conduct is not a fundamental right under the United States Constitution, adultery, likewise, cannot be a fundamental right." *Id.* Accordingly, I concur in the result reached by the majority on appellants' third and fourth issues, but for the reasons set forth below, strongly disagree with the majority's treatment of appellants' state and federal equal protection arguments.

## I.

### Application of Equal Protection to Section 21.06: An Overview

Appellants contend section 21.06 violates their rights of equal protection under the United States and Texas Constitutions. Under the Fourteenth Amendment, the statute must fail because even applying the most deferential standard, the rational basis standard, the statute cannot be justified on the majority's sole asserted basis of preserving public morality, where the same conduct, defined as "deviate sexual intercourse" is criminalized for same sex participants but not for heterosexuals. The contention that the same conduct is moral for some but not for others merely repeats, rather than legitimizes, the Legislatures' unconstitutional edict. The statute must also fail because statutory classifications that are not gender neutral are analyzed under the heightened scrutiny standard of review, and there is no showing by the State either that there is an exceedingly persuasive justification for the classification, or that there is a direct, substantial relationship between the classification and the important government objectives it purports to serve.

Similarly, section 21.06 cannot withstand scrutiny under the Texas ERA, Article I, § 3a of the Texas Constitution. The ERA is part of the Texas Bill of Rights. Under Article I, § 29 of the Bill of Rights, the Inviolability Clause, statutes that contravene anything in the Bill of Rights are *per se* void. Because section 21.06 discriminates on the basis of gender, thus violating Article I, § 3a, it is void. Moreover, applying the less rigorous standard of strict scrutiny, mandated by *McLean,* produces the same result. *In re McLean,* 725 S.W.2d 696 (Tex.1987). Under strict scrutiny as applied in Texas, the proponent of gender discrimination must demonstrate a compelling interest and that there is no other manner to protect the state's compelling interest. *Id.* This requirement places the burden to support the statute squarely upon the State and not on the challenger, and the State, as discussed here and in this Court's original opinion, has failed to make the required showing to defeat a challenge under the Texas ERA.

## II.

### Section 21.06 and the Fourteenth Amendment: Equal Protection, Gender, and Heightened Scrutiny Review

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The general rule is that legislation is presumed valid and will be sustained if the

classification drawn by the statute is rationally related to a legitimate state interest. *Id.* However, within the three-tiered federal equal protection scheme, legislative classifications based on gender call for a heightened standard of review, one step below the most rigorous strict scrutiny review applied to statutory classifications based on race, alienage, or national origin. *Id.* Under the heightened standard, a gender classification fails unless it is substantially related to a sufficiently important governmental interest. *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982).[1]

### A. Section 21.06 Is Not Gender Neutral

In its analysis of appellants' gender discrimination contention, the majority attempts to transfer the burden of proof to appellants to show the statute has had an adverse effect upon one gender, and that such disproportionate impact can be traced to a discriminatory purpose. This transfer is based on the naked assertion that section 21.06 is gender-neutral because it does not impose burdens on one gender not shared by the other. That 21.06 is not gender neutral is manifest based on application of the statute to the following events:

There are three people in a room: Alice, Bob, and Cathy. Bob approaches Alice, and with her consent, engages with her in several varieties of "deviate sexual intercourse," the conduct at issue here. Bob then leaves the room. Cathy approaches Alice, and with her consent, engages with her in several kinds of "deviate sexual intercourse." Cathy is promptly arrested for violating section 21.06.

I have indulged in this tableau to demonstrate one important point: one person simply committed a sex act while another committed a crime. While the acts were exactly the same, the gender of the actors was different, and it was this difference alone that determined the criminal nature of the conduct. In other words, because he is a man, Bob committed no crime and may freely indulge his predilection for "deviate sexual intercourse," but because she is a woman, Cathy is a criminal. Thus, women are treated differently in this scenario, and therefore, are discriminated against by the explicit gender-based prohibition of section 21.06, and to suggest otherwise is disingenuous at best.[2] It is also no answer to insist that because the statute also subjects men to similar discrimination in different scenarios, somehow the discrimination here is rendered constitutionally acceptable. Discrimination in one instance is not cured by additional discrimination in another. Moreover, section 21.06 grew out of the revision of the penal code in 1973.[3] In the new statute, two

---

1. The best short analysis of the three tests for considering whether legislation violates the Equal Protection Clause of the Fourteenth Amendment is set out in *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988):

 At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. Classifications based on race or national origin, and classifications affecting fundamental rights are given the most exacting [or strict] scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy.

2. The characteristic injury of gender discrimination lies not in the failure to be treated on a gender-blind basis, but rather in being deprived of opportunity because one is a woman, or because one is a man. LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 16–29 (2d. ed.1988).

3. Convening in 1973, the 63rd Legislature, passed the revised Penal Code, which was

standards were created, demarcated by the sex of the actors: deviate sexual intercourse when performed by a man and a woman would henceforth be legal, but deviate sexual intercourse performed by two men or two women would remain illegal. Thus, after 1974, the distinction between legal and illegal conduct was clearly not the act, but rather the sex of one of the participants.

## B. *Equal Discrimination Argument Not A Cure*

While not precisely a model of clarity, the majority appears to accept the State's contention that because section 21.06 applies equally to men and women, the statute does not discriminate on the basis of gender. I draw this conclusion based on the majority's rejection of appellants' argument that *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) discredited the "equal application" defense of 21.06, and conclusion that 21.06 does not impose burdens on one gender not shared by the other. However, the United States Supreme Court has rejected the majority's position in a variety of cases.

One example of the Court's rejection of the "equal discrimination" argument is found in *United Bldg. and Const. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 217–18, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). In that case, the Supreme Court invalidated a municipal ordinance in Camden, New Jersey, requiring that at least forty percent of employees working on city construction projects be city residents. Camden's Mayor and City Council argued the ordinance did not violate the strictures of the Privileges and Immunities Clause of the Fourteenth Amendment, which requires that out-of-state residents be afforded the same job

opportunities as in-state residents, because not only out-of-state residents were burdened by the ordinance. In fact, the respondents argued, many in-state residents, who did not live within the city of Camden, were as burdened by the ordinance as the out-of-state workers who brought the suit. Rejecting the "equal discrimination" argument, the Supreme Court stated "the Camden ordinance is not immune from constitutional review at the behest of out-of-state residents merely because some in-state residents are similarly disadvantaged." *Id.* (citing *Zobel v. Williams*, 457 U.S. 55, 75, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (O'Connor, J., concurring)).

A second example of the Court's rejection of additional "curative" discrimination is noted in *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). In *Hunter*, the Court struck down a provision of the Alabama Constitution that mandated disenfranchisement for people who committed "crimes of moral turpitude." Although facially neutral, the Court determined the provision was enacted with the intent of discriminating against blacks and disparately impacted blacks as well because it had disenfranchised ten times as many blacks as whites. *Id.* at 227, 105 S.Ct. 1916. Appellant, the State of Alabama, argued that although the constitutional provision was intended to discriminate against blacks, it did not violate the Equal Protection Clause because it was also intended to discriminate against poor whites. The Court held that the intention to additionally discriminate against whites "hardly saves [the Alabama provision] from invalidity." *Id.* at 231, 105 S.Ct. 1916. An additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against blacks. *Id.* at 232, 105 S.Ct. 1916.

enacted in 1974. *See* Acts 1973, 63rd Leg., ch. 399, § 1, 1973 Tex. Gen. Laws 917.

Thus, again, the Court declined to accept additional discrimination as a purported cure for a clearly discriminatory law.

Finally, the Supreme Court discussed the logic of an argument analogous to the State's argument here in *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). There, the State of Virginia argued that Virginia's miscegenation statutes do not constitute invidious racial discrimination because the statutes apply equally to whites and blacks. *Id.* at 8, 87 S.Ct. 1817. The miscegenation statutes, the State contended, equally penalized both whites who intermarried and blacks who intermarried; therefore, the "equal application" of the statutes rendered them acceptable under the Fourteenth Amendment using a rational basis standard. *Id.* Rejecting this sophistry, the Court responded that the mere equal application of a statute containing racial classifications does not remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discrimination. *Id.* By using the race of an individual as the sole determinant of the criminality of his conduct, the State created and perpetuated an invidious racial classification in violation of the Fourteenth Amendment. *Id.* at 11, 87 S.Ct. 1817. Accordingly, the Court reaffirmed the propriety of strict scrutiny and struck down the Virginia statutes as unconstitutional. *Id.* at 12, 87 S.Ct. 1817.

I would also reject the equal application argument offered here. Merely punishing men who engage in sodomy with other men and women who engage in sodomy with other women equally, neither salvages nor cures the discriminatory classification contained in this statute. The simple fact is, the same behavior is criminal for some but not for others, based solely on the sex of the individuals who engage in the behavior. In other words, the sex of the individual, not the conduct, is the sole determinant of the criminality of the conduct.

Indeed, the State's and the majority's utilization of the equal application justification for 21.06 detrimentally impacts their unified position. If in *Loving* the equal application of the anti-miscegenation statutes to both blacks and whites did not negate the existence of a racial classification, then here, equal application of the anti-homosexual-sodomy statute to both men and women does not negate the existence of a sex classification. Alternatively, if 21.06 does not contain a sex-based classification because it applies equally to men and women, then the anti-miscegenation statutes in *Loving* did not contain a race-based classification, with the logical corollary that *Loving* was wrongly decided. Here, the State and the majority go to great lengths to manufacture a conclusion that 21.06 is gender neutral. They must, because acknowledging the facial and as applied gender discrimination within 21.06 vitiates any defense of that statute inasmuch as the State has failed to establish either that the classification created by the statute is substantially related to important and legitimate government objectives, the test applied under heightened scrutiny, or identify a compelling state interest for purposes of strict scrutiny.

The issue regarding whether 21.06 is gender neutral lies at the core of this case. The majority, in a somewhat cursory fashion, dispenses with *Loving* and moves quickly to the conclusion of gender neutrality without addressing, among other things, the tableau set forth above in this part II. This conclusion of neutrality is essential for the majority to access the rational basis review, avoid heightened scrutiny mandated for gender discrimination, and most importantly, avoid any analysis of appellants' claims under the Texas

ERA. However, limiting analysis of 21.06 to rational basis review is incomplete.

In an equal protection analysis of a legislative classification such as that drawn in 21.06, the appropriate framework for reviewing the scheme is to first ask whether the law survives rational basis analysis, and, if it does, the second inquiry is whether the distinction will pass heightened scrutiny. *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 618, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). Both *Hooper* and *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) analyzed statutory classifications violating the Equal Protection Clause by deferring heightened scrutiny analysis until a determination is made that it survived a rational basis analysis. *Attorney Gen. of New York v. Soto–Lopez,* 476 U.S. 898, 904, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). Thus, here, because the majority has determined that 21.06 survives rational basis scrutiny, and fails to then apply heightened scrutiny review, its analysis under the Equal Protection Clause is incomplete. *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) is consistent with this approach. There, because Amendment 2 was in violation of the Equal Protection Clause applying rational basis review, there was no need to examine the statute under heightened scrutiny. Thus, the majority's conclusion that 21.01 is gender neutral will not allow omission of heightened scrutiny review.

C. *Standard of Review For Gender Discrimination*

Inasmuch as section 21.06 is not gender-neutral, the next inquiry is determining the appropriate burden of proof and assigning that burden. In 1982, in *Mississippi University for Women,* the Court held that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an "exceedingly persuasive justification" for the classification. 458 U.S. at 724, 102 S.Ct. 3331. The burden is met only by showing, at a minimum, that the classification serves important governmental objectives. *Id.* There is, however, a further inquiry if the State's objective is legitimate and important. The reviewing court must then determine whether the requisite direct, substantial relationship between the objective sought and means used is present. *Id.* This is heightened scrutiny.

The Supreme Court again addressed the issue of whether the Equal Protection Clause forbids gender based discrimination in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Specifically, the Court examined the use of peremptory challenges on the basis of gender under the dictates of the Equal Protection Clause and the court's holding in *Batson v. Kentucky,* which prohibits peremptory strikes solely on the basis of race. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The court held the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender. *J.E.B.,* 511 U.S. at 146, 114 S.Ct. 1419. In reaching that conclusion, the *J.E.B* Court acknowledged that "our Nation has had a long and unfortunate history of sex discrimination," a history which warrants the heightened scrutiny afforded all gender-based classifications. *Id.*

In *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), the Supreme Court reiterated the burden of proof for cases of official classification based on gender as requiring the reviewing court to determine whether the proffered justification is exceedingly persuasive, and declared "[t]he burden of justification is demanding and it rests entirely on the State." Further, the Court held that the justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. *Id.* And, it must not

rely on overbroad generalizations about different talents, capacities, or preferences of males and females. *Id.* This is the heightened review standard applied to classifications based on sex. *Id.*

### D. *Failure to Satisfy the Heightened Scrutiny Standard*

In its original brief filed with this court, the State contends that section 21.06 must be upheld if there is any rational relationship between the disparity of treatment reflected in that statute and a legitimate state interest. The State seeks to apply the general rule that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. To satisfy the rational relationship burden, the State asserts the statute is rationally related to permissible governmental purposes, the discouragement of behavior historically perceived to be immoral, and the promotion of family values. This assertion was reiterated in the State's brief in support of its motion for rehearing en banc. The majority also adopts this rational relationship standard.[4] The State's and the majority's arguments that 21.06 survives a challenge under federal equal protection are untenable.[5]

First, the State and the majority have applied the wrong standard. As set out in *City of Cleburne*, the three standards of equal protection review, from highest to

**4.** The majority's entire analysis of appellants' equal protection issues is premised on the belief that 21.06 is gender neutral on its face. The comparison of 21.06 and the definition of "deviate sexual intercourse" in 21.01 set out in note 9 below, I believe, adequately dismantles facial neutrality contentions. This misinterpretation of 21.06 has led the majority into error. Moreover, for unexplained reasons, the majority has merged a due process analysis with an equal protection analysis by stating there is no fundamental right to engage in sodomy. Whatever the merits of that contention, it is sourced from the Court's analysis of the Due Process Clause in *Bowers v. Hardwick* where the Court was unwilling to extend the Due Process Clause to confer "a fundamental right to engage in acts of consensual sodomy." 478 U.S. 186, 192, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). This blending of quite distinct elements of the Federal Constitution blunts the force of the majority's equal protection arguments. Indeed, that the majority is in fact attempting to analyze 21.06 under the Due Process Clause is manifest from (a) its failure to address how a ban of homosexual sodomy preserves public morals while permitting heterosexual sodomy, but (b) justifying the statute based on historical analysis and the common law, and references to seventeenth century laws banning homosexual conduct in the Massachusetts Bay Colony. *See* discussion of Cass Sunstein's analysis of the distinctions between the Due Process and Equal Protection Clauses at note 12 below.

Nevertheless, even assuming the statute is gender neutral on its face, it is not gender neutral as applied, an argument also advanced by appellants. I have, in part II A above, demonstrated the application of section 21.06 is not gender neutral when applied to appellants. The majority recognizes that a facially neutral statute may support an equal protection claim where it is motivated by discriminatory intent and its application results in a discriminatory effect, citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Despite this acknowledgment of the rule, the majority prefers here, as elsewhere in the opinion, to impose a burden of proof not required in an inquiry based on gender discrimination. The Supreme Court has consistently subjected gender-based classifications to heightened scrutiny in recognition of the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of archaic and overbroad generalizations. *J.E.B.*, 511 U.S. 127, 135, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

**5.** The majority's statement that the State can, in many instances, pass laws the purpose of which is to preserve morals is correct. However, that license is subject to the Equal Protection Clause, and if the statute is not rationally related to the asserted State interest, or classifies on the basis of gender without a compelling state interest, the license is revoked.

lowest, are strict scrutiny, heightened review, and rational relationship. 473 U.S. at 440–441, 105 S.Ct. 3249. Under *Heitman v. State,* the court held that decisions of the Supreme Court represent the minimum protections that a state must afford its citizens. 815 S.W.2d 681, 690 (Tex. Crim.App.1991). The federal constitution sets the floor for individual rights, and state constitutions cannot subtract from the rights guaranteed by the United States Constitution; however, they can provide additional rights to their citizens. *Id.* It appears, therefore, that the State and the majority have attempted to apply a lower threshold standard of review to gender-based discrimination than the heightened standard mandated by the United States Supreme Court. It is not within the discretion of an intermediate court to ignore United States Supreme Court precedent regarding the appropriate standard of review for gender based classifications challenged, as appellants have done here, under the Equal Protection Clause of the Fourteenth Amendment. The court in *Heitman* stated the rule more succinctly: this court is not at liberty to reduce the protections afforded its citizens to a level less than that established under the federal constitution. 815 S.W.2d at 690. *A fortiori,* by applying the improper standard of review, the majority has accomplished the following: it has afforded appellants a level of protection less than that prescribed by courts whose opinions we are required to follow.

Second, the majority apparently has accepted the State's obfuscation of the issue of gender discrimination in 21.06, thus lowering the State's burden of proof. It is well established that a gender classification fails unless the party seeking to uphold the statute satisfies the dual burden of showing a persuasive justification or objective for the classification and that the discriminatory means employed are substantially related to the objective. *Mississippi Univ. for Women,* 458 U.S. at 724–725, 102 S.Ct. 3331. Where, as here, there is not even a whisper or hint in the majority opinion purporting to demonstrate how the State satisfied the *minimum* rational relationship showing required to sustain 21.06 in the face of an equal protection challenge, it is difficult to understand how the majority can conclude 21.06 does not violate appellants' federal equal protection rights.[6]

### E. *Proper Application of Heightened Scrutiny Review*

Turning now to the case *sub judice,* a rather succinct two part test exists for evaluating the validity of the gender-based classification in 21.06 against a federal equal protection challenge, and it is couched in terms of dual burdens on the proponent of the statute: (1) has the proponent demonstrated a legitimate and exceedingly persuasive justification for the gender based classification contained in 21.06; and (2) has the proponent demonstrated the requisite direct, substantial relationship between the classification and the important government objectives it purports to serve. *Heckler v. Mathews,* 465 U.S. 728, 745, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984).

(1). The justification asserted here for 21.06 is promotion of family values and discouragement of immoral behavior. At the outset, it should be noted that "promotion of family values" has not been defined by the State, but it is not illogical to assume that it has some relationship to the

---

**6.** As noted above, the majority's equal protection analysis is incomplete because it fails to engage in intermediate scrutiny required for review of a challenged classification under the Equal Protection Clause where, as here, the majority has concluded 21.06 satisfies rational basis review. *Hooper,* 472 U.S. at 618, 105 S.Ct. 2862.

institution of marriage and procreation. Thus, the State's contention must be that permitting deviate sexual intercourse between heterosexual couples promotes family values while such conduct by same sex couples promotes something less than that. What is interesting to note is the fact that deviate sexual intercourse, as defined in section 21.01 of the Penal Code, regardless of the gender of one's sex partner, will not permit a female's ovum to be fertilized, thus creating a pregnancy. It must, therefore, be concluded that the State's acquiescence in heterosexual deviate sexual intercourse permits heterosexuals, whether married or not, to engage in a variety of historically repugnant "recreational sex" acts. To contend, as the State must, that a man somehow promotes family values by engaging in deviate sexual intercourse with a woman, but undermines those values by performing the same deviate sex act with a man, does not, in my view, constitute a showing of an exceedingly persuasive justification for the gender based classification in 21.06.[7]

Nor does the asserted justification of discouraging immoral behavior constitute such a showing. The behavior to be *discouraged* is deviate sexual intercourse between same sex couples. That same behavior between heterosexual couples is, by implication, moral and something to be *encouraged*. Sodomy is either immoral or it is not. It appears that the State's vigorous defense of 21.06 has been advanced without due consideration of the inconsistency of, on the one hand, condemning sodomy as immoral, but on the other implicitly embracing sodomy as perfectly moral. Again, such incongruity is not exceedingly persuasive.

(2). Because the test articulated in *Heckler* is described in the conjunctive, it follows that if the State has failed to articulate a legitimate and exceedingly persuasive justification, we need not reach the second part of the test. Nevertheless, even if family values and prevention of immoral behavior were legitimate and persuasive justifications for the gender classification, the discussion above demonstrates there is no connection between penalizing homosexual sodomy and the achievement of those objectives. Neither heterosexual sodomy nor homosexual sodomy can create a new life. Further, encouraging heterosexual sodomy and punishing homosexual sodomy, as a Class C misdemeanor with a fine only, scuttles the State's asserted purpose of preventing immoral behavior inasmuch as 21.06 permits deviate sexual intercourse by any man with any woman. Thus, the State has failed to make a showing of how the gender-based classification is substantially and directly related to the proffered objective of discouraging immoral behavior. Perhaps this failure rests, in part, on the apparent impossibility of logically explaining how the classification in 21.06 is even remotely related to that objective where such behavior is simultaneously sanctioned and is presumably engaged in routinely. Where, as here, the proponent of a gender-based statutory classification fails to establish the requisite relationship between the objective and the means used to achieve it, the statute is invalid. *See Mississippi Univ. for Women,* 458 U.S. at 730, 102 S.Ct. 3331.

The mere recitation of a benign purpose is not an automatic shield that protects

---

**7.** Because the Court in *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), implicitly rejected the justification of promoting family values in a rational basis analysis of a statute that discriminated against homosexuals based on sexual orientation, it follows that those same justifications, advanced here, could not satisfy heightened scrutiny. *See* part III below.

against any inquiry into the actual purposes underlying a statutory scheme. *Id.* at 728, 102 S.Ct. 3331. Having performed the analysis dictated by intermediate scrutiny, it must be concluded the State failed both to articulate a persuasive justification and to demonstrate a direct relationship between the tendered objectives and the means utilized to achieve those objectives in 21.06. In the absence of legitimate objectives, the inevitable inference is raised that the disadvantage to homosexuals contained in 21.06 is born of animosity toward the persons affected. *See Romer,* 517 U.S. at 634, 116 S.Ct. 1620. The Legislature's removal of the prohibition on heterosexual sodomy while retaining it for homosexual sodomy cannot, in my view, be explained by anything but animus toward the persons it affects.[8]

Indeed, the State's purported justification for the classification in 21.06 in terms of upholding public morality founders on the distinction between public and private morality. The private morality of an individual is not synonymous with nor necessarily has an effect on what is known as public morality. The majority believes 21.06 preserves public morals. That conclusion is apparently reached *sua sponte* without the slightest showing by the State that such consequence flows from enforce-

ment of 21.06. As set forth above, the State's general contention is that the statute discourages immoral behavior, without regard to the public or private nature thereof. Nevertheless, addressing the majority's contention, we are not told how government interference with the practice of adult only, consensual personal choice in matters of intimate sexual behavior out of view of the public and with no commercial component will serve to advance the cause of "public morality" or do anything other than restrict individual conduct and impose a concept of private morality chosen by the State. Here again, when one applies the clear test, articulated in *Heckler* and elsewhere, that a gender-based classification must fail an equal protection challenge absent a showing that the classification is substantially and directly related to the preservation of public morality, the conclusion is obvious. Perhaps this is the reason the majority labors so hard to conclude 21.06 is gender neutral.[9]

## III.

### Equal Protection, Improper Classifications and Rational Basis Review

#### A.

##### *Romer v. Evans*

I firmly believe 21.06 establishes a gender-based classification, on its face and as

---

**8.** My conclusion that 21.06 was born out of animus towards the persons affected thereunder is buttressed by the statute's evolution. Until 1974, the penal code prohibited oral and anal copulation "with another human being." Thus, the statute prohibited all acts of sodomy, whether performed by members of the opposite or the same sex. *Pruett v. State,* 463 S.W.2d 191, 193 (Tex.Crim.App.1970). In 1974, a new penal code was enacted wherein sodomy performed by members of the same sex continued to be proscribed, but the same act performed by members of the opposite sex became, for the first time in 114 years, legal.

**9.** That 21.06 is not gender neutral on its face is demonstrated by the language in the stat-

ute. "A person commits an offense if he engages in deviate sexual intercourse *with another individual of the same sex.*" Tex. Pen. Code Ann. § 21.06 (Vernon 1994) (emphasis added). The statute clearly specifies what the gender of the actors must be to constitute a criminal offense. Curiously, the definition of "deviate sexual intercourse" contained in section 21.01 is gender neutral. Such conduct is defined as "any contact between any part of the genitals of *one person* and the mouth or anus of *another person;* or . . . the penetration of the genitals or the anus of *another person* with an object." Tex. Pen.Code Ann. § 21.01 (Vernon 1994) (emphasis added).

applied, in the Penal Code of the State of Texas that will not withstand middle tier scrutiny mandated for the analysis of such classifications under the Equal Protection Clause of the Fourteenth Amendment. Appellants, however, also challenge the statute because it unconstitutionally discriminates against homosexuals, thus imposing an unequal burden on them based on their sexual orientation because heterosexuals are not targeted by 21.06 when engaging in the same conduct. Here, the rational basis test, much preferred by the State, *is* applicable, but the result of a correct analysis applying federal precedent is contrary to the outcome sought by the State.

The case that controls the disposition of appellants' contention that section 21.06 discriminates against a class based on sexual orientation is *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)[10]. In *Romer,* the United States Supreme Court held that a Colorado constitutional amendment (Amendment 2) prohibiting official protection from discrimination on the basis of sexual orientation violated the Fourteenth Amendment's Equal Protection Clause. Using a rational basis standard of review, the most deferential test, the Court invalidated Amendment 2 which (1) contained a classification of "homosexuals," and (2) withdrew from homosexuals, but no others, legal protection from discrimination and prohibited reinstatement of these laws and policies. *See id.* at 627, 116 S.Ct. 1620.

The primary rationale advanced by the State for Amendment 2, adverted to in the opinion, was respect for other citizens' freedom of association, and, in particular, the liberties of landlords or employers who have personal or religious objections to homosexuality. *Id.* at 635, 116 S.Ct. 1620. In striking down Amendment 2, the Court stated, that "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Id.* at 633, 116 S.Ct. 1620. The inequality the Court detected was that homosexuals were singled out by Amendment 2 and accorded less protection of the law solely by virtue of their membership in the class. *Id.* at 635, 116 S.Ct. 1620. Although the Court utilized a rational basis standard for its analysis, Amendment 2 still failed this most deferential standard because the Court found the amendment advanced no legitimate government interest. *Id.* Thus, the *Romer* Court concluded Amendment 2 classified homosexuals not to further a proper legislative end, but to make them unequal to everyone else. *Id.*

Interestingly, Petitioner, the State of Colorado, offered other justifications for Amendment 2 similar to those offered by the State here.[11] In *Romer,* the State argued the "legitimate governmental interests" of Amendment 2 were the promotion of traditional moral norms and family values. *See* Petitioner's Brief at 45–47, *Romer* (1995 WL 310026). Specifically, the State posited the amendment fostered "family privacy and the ability to convey values to their children," by disallowing the "implicit endorsement of homosexuali-

---

10. Section B of this part III examines the application of the rational basis review to a city ordinance where the justifications for the classification it contained did not justify singling out one group for different treatment, thus rendering the classification irrational and unconstitutional as applied.

11. In note 15, the majority refused to accept the fact that the State of Colorado *did* in fact make those arguments in its brief. Even though the arguments are not set out in the opinion, a reader may access them by going through the WestLaw reference in the *Romer* opinion, which brings up the briefs containing the rejected arguments. 517 U.S. at 621, 116 S.Ct. 1620.

ty fostered by laws granting special protections [that] could undermine the efforts of some parents to teach traditional moral values," and deterred factionalism within the state by "maximiz[ing] individual liberty, including the preservation of traditional norms." *Id.*

Far from accepting these justifications as legitimate, the Court apparently did not find they even merited review in the opinion. Thus, the Court, *sub silentio*, rejected the "implementation of traditional notions of morality" justification deemed sufficient in *Bowers v. Hardwick*, 478 U.S. at 196, 106 S.Ct. 2841, and *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir.1985), both of which are relied upon by the State here.[12] In *Romer*, the Supreme Court focused, instead, upon the animus apparent from a provision that drew a classification "for the purpose of disadvantaging the group burdened by the law." 517 U.S. at 633, 116 S.Ct. 1620. Because Amendment 2 drew such a classification, and then proceeded to disadvantage homosexuals be-

---

**12.** Justice Scalia's dissent in *Romer* concedes as much. He notes, that in "plac[ing] the prestige of [the Supreme Court] behind the proposition that opposition to homosexuality is as reprehensible as racial or religious bias," the Court has essentially *sub silentio* overruled *Bowers*. 517 U.S. at 636–37, 116 S.Ct. 1620. I agree with this characterization of *Romer*, and further note the rational basis analysis employed by the *Romer* Court may be more exacting than that employed by the Court in *Bowers*. The concurring opinion by Justice Fowler fails to appreciate the difference in the rational basis test as applied in a *Bowers* due process analysis versus a *Romer* equal protection analysis.

Although both *Bowers* and *Romer* applied the rational basis analysis to the state action in question, there is, nevertheless, a difference in the analysis of rational basis review under the Due Process Clause and under the Equal Protection Clause. These two clauses perform quite different functions. In its substantive dimension, the Due Process Clause protects a range of basic rights; it does not speak to the constitutionality of classifications. The Equal Protection Clause operates as a functional complement to the Due Process Clause, addressing a different set of questions. The Due Process Clause has frequently been understood as an effort to restrict short-term or shortsighted deviations from widely held social norms; it has an important backward looking dimension. For purposes of due process, the baseline for inquiry has tended to be the common law, Anglo American practice, or the status quo. The Due Process Clause is, therefore, closely associated with the view that the role of the Supreme Court is to limit dramatic and insufficiently reasoned change, to protect tradition and to bring a more balanced and disinterested perspective to legislation. *See* Cass R. Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection*, 55 U. CHI. L.REV. 1161, 1171 (1988). Thus, in *Bowers*, the Court declined to find, as respondent requested, a fundamental right to engage in homosexual sodomy because sodomy was not a fundamental liberty that was deeply rooted in this Nation's history and tradition. *Bowers*, 478 U.S. at 192, 106 S.Ct. 2841.

The Equal Protection Clause, on the other hand, has served an entirely different set of purposes from the Due Process Clause. That clause is emphatically not an effort to protect traditionally held values against novel or short-term deviations. The clause is not backward looking at all; it was consciously designed to eliminate practices that existed at the time of ratification and that were expected to endure. The function of the Equal Protection Clause is to protect disadvantaged groups against the effects of past and present discrimination by political majorities. It is not rooted in common law or status quo baselines or in Anglo–American conventions. The baseline is instead a principle of equality that operates as a criticism of existing practice. The clause does not safeguard traditions; it protects against traditions, however long standing and deeply rooted. Sunstein, *supra* at 1174. Thus, Justice Fowler's conclusion, that rational basis review under the Due Process Clause is the same as rational basis review under the Equal Protection Clause ignores the important distinction between the functions of the two clauses and how that distinction shapes review under each clause using the rational basis standard.

cause of their membership in the class, the amendment violated the equal protection of the law guaranteed by the Fourteenth Amendment.

The statute at issue here, much like Amendment 2, draws a classification for the purpose of disadvantaging the group burdened by the law. In fact, Justice Scalia, in his dissent to *Romer* readily agreed that, "there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Id.* at 641, 116 S.Ct. 1620. I agree with Justice Scalia that the statute at issue here, by proscribing "deviate sexual intercourse" only when engaged in with members of one's own sex, does discriminate against homosexuals. However, following *Romer*, I view the justifications proffered by the State, enforcement of traditional norms of morality and family values, as nothing more than politically-charged, thinly-veiled, animus-driven clichés.[13] Section 21.06 is, like Amendment 2, a status-based enactment divorced from any factual context from which one can discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit. *Id.* at 635, 116 S.Ct. 1620. Although a state's police powers are broad and comprehensive, the constitution, both state and federal, "forbids its exercise when the result would be the destruction of the rights, guarantees, privileges, and restraints excepted from the powers of government by the Bill of Rights." *Fazekas v. University of Houston*, 565 S.W.2d 299, 305 (Tex.Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) (citing *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007 (1934)). Thus, stripped of its asserted justifications, the classification drawn in 21.06 is arbitrary and irrational, and fails the rational basis test.

Regarding appellants' issue on sexual orientation discrimination aspect of 21.06, the majority, *inter alia*, concludes there is no fundamental right to engage in sodomy, and homosexuals do not constitute a suspect class. These two conclusions are irrelevant here because appellants do not raise these arguments, and the first conclusion implicates *Bowers v. Hardwick* where equal protection was not argued or addressed.

## B.

### City of Cleburne

Legislation containing a classification challenged under the Equal Protection

---

**13.** I am not unmindful of the sensibilities of many persons who are deeply persuaded that homosexual sodomy is evil and should be prohibited. That is not the issue here. Rather, the federal equal protection issue before this court, which I believe should be answered in the negative, is whether the Federal Constitution permits discriminatory recourse to the sanctions of the criminal law for the achievement of that objective. The community and its members remain entirely free to employ theological teaching, moral persuasion, parental advice, psychological and psychiatric counseling, and other noncoercive means to condemn the practice of homosexual sodomy. *People v. Onofre*, 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936, 941 n. 3 (1980). Alternatively, if the legislature wishes to abolish what it views as immoral behavior, it is free to do so, provided that it does not single out a class of people for the prohibition, while freely permitting other classes to engage in the same behavior, thereby, again, running afoul of the federal Equal Protection Clause. But the law regarding the use of the criminal law to implement biases is clear: "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *City of Cleburne*, 473 U.S. at 448, 105 S.Ct. 3249 (using rational relationship test to invalidate zoning ordinance requiring a special use permit for home for the mentally retarded where no special permit required for other similar multiple dwelling facilities).

Clause must, in order to withstand rational basis review, be rationally related to a legitimate governmental purpose. *City of Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249. The State may not rely, however, on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. *Zobel,* 457 U.S. at 61–63, 102 S.Ct. 2309. Objectives such as a bare desire to harm a politically unpopular group are not legitimate State interests. *City of Cleburne,* 473 U.S. at 447, 105 S.Ct. 3249.

In *City of Cleburne,* the Court struck down a city zoning ordinance requiring a special use permit for a home for the mentally retarded, but exempting from such a permit apartment houses, fraternity houses, apartment hotels, hospitals, private clubs and other specified uses. *Id.* Plainly stated, the equal protection issue there presented was: "May the city require the permit for this facility when other care and multiple dwelling facilities are freely permitted?" *Id.* at 448, 105 S.Ct. 3249. The Federal District Court had found, and the Court of Appeals and Supreme Court repeated the obvious fact that if the potential residents of the home for the mentally retarded were not in fact so afflicted, and the home was the same in all other respects, its use would be authorized under the zoning ordinance. *Id.* at 449, 105 S.Ct. 3249.

The city presented several bases supporting the ordinance: fear and negative attitudes by residents living near the facility; location of the home in a five hundred year flood plain; the size of the home and the number of people who would occupy it. The *City of Cleburne* Court demonstrated how each factor presented by the city made no sense in light of how the city treated other groups similarly situated in relevant respects. *Id.* at 448–450, 105 S.Ct. 3249. Because none of the asserted bases rationally justified singling out a home for the retarded for the special use permit, while imposing no such restrictions on other uses freely permitted in the neighborhood, the Supreme Court concluded:

> [R]equiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded, including those who would occupy the [home] and who would live under the closely supervised and highly regulated conditions expressly provided for by state and federal law.

*Id.* at 450, 105 S.Ct. 3249.

Applying the *City of Cleburne* rational basis review here, because the State's grounds purporting to justify 21.06 do not rationally justify criminalizing same sex sodomy while imposing no such burden on others engaging in acts defined as deviate sexual intercourse, the classification is arbitrary and irrational and driven by prejudice. It makes no sense for the State to contend that morals are preserved by criminalizing homosexual sodomy while supporting sodomy by heterosexual couples, including unmarried persons. The State simply may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. *Zobel,* 457 U.S. at 61–63, 102 S.Ct. 2309. Where, as here, the State interest of preserving morality is irrational in light of authorization of the same immoral acts by others, the statute fails rational basis review under the Equal Protection Clause and should be held in violation of the United States Constitution. *Heller v. Doe by Doe,* 509 U.S. 312, 324, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (stating a statutory classification fails rational basis review when it rests on grounds wholly irrelevant to achievement of the state's objective).

The majority's discussion of the historical definitions of sodomy, which includes a reference to a seventeenth century law of the Massachusetts Bay Colony, suggests that homosexuals have been subjected to a tradition of disfavor. In his concurring opinion in *City of Cleburne*, Justice Stevens, joined by Chief Justice Burger, distanced himself from the tiered analysis of equal protection claims because, he believed, the rational basis test is suitable for all such inquiries. 473 U.S. at 452, 105 S.Ct. 3249. In every equal protection case, he wrote, we have to ask certain basic questions: What class is harmed by the legislation, and has it been subjected to a "tradition of disfavor" by our laws? *Id.* at 453, 105 S.Ct. 3249. In a footnote to this question, Justice Stevens stated the following:

> The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a tradition of disfavor [for] a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification. Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is made. *Id.* at n. 6.

Because the State has not shown a valid state interest for 21.06 that is rationally served by proscribing sodomy only when performed by homosexuals, the unavoidable conclusion is that the statute was merely a continuation of the stereotyped reaction to a traditionally disfavored group. By its unquestioning acceptance of the State's justification for the statute, the majority has overlooked the illegitimate stereotyping lying at the core of 21.06.

## C.

Judge Norris, concurring in *Watkins v. U.S. Army,* 875 F.2d 699, 720 (9th Cir. 1989), captured, in my view, the core rationale underlying the Equal Protection Clause of the Fourteenth Amendment. He wrote that the equal protection doctrine does not prevent the majority from enacting laws based on its substantive value choices. Equal protection simply requires that the majority apply its values evenhandedly. *Id.* Indeed, the equal protection doctrine plays an important role in perfecting, rather than frustrating, the democratic process. The constitutional requirement of evenhandedness advances the political legitimacy of majority rule by safeguarding minorities from majoritarian oppression. *Id.*

Therefore, I would hold section 21.06 violates the Equal Protection Clause based on appellants' contentions that it discriminates based on both gender and sexual orientation. Accordingly, I would sustain appellants' first point of error challenging 21.06 on federal equal protection grounds, as applied and on its face.

## IV.

### Section 21.06 and The Texas Equal Rights Amendment

Appellants also challenge 21.06 contending it violates Article I, § 3a of the Texas Constitution in that it proscribes otherwise lawful behavior solely on the basis of the sex of the participants. That provision of the Texas Bill of Rights provides as follows:

> Equality under the law shall not be denied or abridged because of sex, race,

color, creed, or national origin. This amendment is self-operative.

In my opinion, there are two standards by which review of section 21.06 may be made in the face of a challenge under the Texas ERA. The first is a *per se* rule based on the mandate of Article I, § 29 of the Texas Bill of Rights, and the second is strict scrutiny under the guidance of *In re McLean*, 725 S.W.2d 696 (Tex.1987).

A. *Per Se Rule*

Article I, § 29 of the Texas Bill of Rights states the following rule regarding the power of the state government to usurp any of the rights contained in Article I of the Texas Constitution:

> To guard against transgressions of the high powers herein delegated, we declare that everything in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.

Section 29 has been interpreted as follows: any provision of the Bill of Rights is self-executing to the extent that anything done in violation of it is void. *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148–149 (Tex.1995). When a law conflicts with rights guaranteed by Article I, the constitution declares that such acts are void because the Bill of Rights is a limit on State power. *Id.* at 149. Indeed, the Bill of Rights consists of express limitations of power on the legislature, executive offi-

cers, and the judiciary. *Republican Party of Texas v. Dietz*, 940 S.W.2d 86, 90 (Tex. 1997) (citing *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007 (1934)). The framers of the Texas Constitution articulated what they intended to be the means of remedying a constitutional violation: a law contrary to a constitutional provision is void. *Bouillion*, 896 S.W.2d at 149.

Thus, while the State, in the exercise of its police powers, may enact legislation reasonably tending to promote the health, comfort or welfare of the public, the extent of this power is limited and must be exercised in conformance with the limitations prescribed by the constitution. *Faulk v. Buena Vista Burial Park Ass'n*, 152 S.W.2d 891–95 (Tex.Civ.App.—El Paso 1941, no writ); *see also Villarreal v. State*, 935 S.W.2d 134, 139 (Tex.Crim.App.1996) (McCormick, P.J., concurring) (characterizing dissent's approach to "privacy expectation" analysis as coming "perilously close to subjecting our constitutional rights too closely to majoritarian political processes and temporary passions of the moment, which is inconsistent with the idea underlying the Bill of Rights.").

Therefore, when the equality guaranteed by the Texas ERA is viewed through the prism of the Texas "Inviolability Clause," [14] it becomes clear that section 21.06, as a non-gender neutral classification created by the legislature in violation of Article I, § 3a, is void. [15]

---

**14.** Article I, § 29 excepts everything in the bill of rights out of the general powers of government and states such rights included therein are to remain inviolate, thus placing these rights beyond the power of the state government to usurp. Tex. Const. Art. I, § 29 interp. commentary (Vernon 1997).

**15.** The majority never really addresses the Texas ERA, or the companion Inviolability Clause, in its analysis of appellants' challenge

to 21.06 on the basis of gender discrimination under the Texas Constitution, even though Rule 47.1 requires that opinions from this Court "address[] every issue raised and necessary to final disposition of the appeal." Tex.R.App. P. 47.1. Nevertheless, by its decision today the majority renders meaningless the action of the people of Texas in placing the ERA in the state constitution, engaging in nothing less than the gratuitous nullification

### B. Strict Scrutiny Under In re McLean

Before examining the precise manner in which the *McLean* court analyzed a statute that discriminated on the basis of sex, it is informative to review what that court had to say about the meaning of the Texas ERA.

The *McLean* court declined to give the Texas ERA an interpretation identical to that given state and federal due process and equal guarantees. 725 S.W.2d at 697. Both the United States Constitution and the Texas Constitution had due process and equal protection guarantees before the ERA was adopted in Texas in 1972. *Id.* If the due process and equal protection provisions and the ERA are given identical interpretations, then the 1972 amendment, adopted by a four to one margin by Texas voters, was an exercise in futility. *Id.* Thus, the *McLean* court concluded the Equal Rights Amendment is more extensive and provides more specific protection than both the United States and Texas due process and equal protection guarantees. *Id.* at 698. The *McLean* court did not, however, adopt a *per se* standard,[16] but instead concluded the Texas ERA elevated sex to a suspect class, thus subjecting any gender discrimination to strict scrutiny, placing the burden on the proponent of the discriminatory provision to demonstrate a compelling interest, *and* that there is no other manner to protect the state's compelling interest. *Id.* (citing *Mercer v. Board of Trust., North Forest Indep. Sch. Dist.*, 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (holding any classification based on sex is suspect classification; thus any law or reg-

ulation classifying persons for different treatment on basis of their sex is subject to strictest judicial scrutiny)). The Austin Court of Appeals has also concluded the Equal Rights Amendment elevates sex to a suspect class, thereby invoking strict scrutiny review when a law differentiates on the basis of gender. *Lens Express, Inc. v. Ewald,* 907 S.W.2d 64, 69 (Tex.App.—Austin 1995, no writ).

Neither the State nor the majority have applied the strict scrutiny mandated by *McLean* and *Mercer.* Nevertheless, that standard must be applied. *McLean* established a two step process for examining a statute challenged as a violation of the ERA. The first step is to determine whether equality under the law has been denied. 725 S.W.2d at 697. That first inquiry is relatively simple. The denial of equality here was under the law because appellants were prosecuted under 21.06 of the Texas Penal Code. In *McLean*, the court held that because disparate treatment of an illegitimate child's father and mother was required by a statute in the Texas Family Code, the denial of equality was under the law. *Id.*

The second inquiry is whether equality was denied because of a person's membership in a protected class of sex, race, color, creed, or national origin. *Id.* As I have discussed above in connection with the analysis of appellants' federal equal protection challenge to 21.06, it is manifest on the face of that statute it is the gender of the particular actors that serves as the trigger for 21.06's prohibitions, so that discussion need not be repeated here. Thus, addressing the second part of the *McLean*

---

of an act of the people of Texas and totally disregarding their expressed constitutional will. *See Barber v. Colorado Indep. Sch. Dist.,* 901 S.W.2d 447, 455 (Tex.1995) (Gammage, J., dissenting to majority's refusal to intervene and apply Texas ERA to a class action chal-

lenging high school's hair length and earring restrictions under the ERA based on gender discrimination).

**16.** There is no reference in *McLean* to Article I, § 29.

test, the focus is on whether the discrimination in 21.06 is prohibited by the ERA. *Id.* Sex-based discrimination is allowed to co-exist with the ERA only when the proponent of the discrimination can prove there is no other manner to protect the state's compelling interest. *Id.* Surprisingly, counsel for the State conceded at oral argument that he could not "even see how he could begin to frame an argument that there was a compelling State interest," much less demonstrate that interest for this Court. The State did offer, however, what it characterized as *legitimate* purposes for the statute: enforcement of principles of morality and promotion of family values.

It is simply not enough for the State to say it has an important interest furthered by the discriminatory law. *Id.* at 698. Even the loftiest goal does not justify sex-based discrimination in light of the clear constitutional prohibition contained in the Texas ERA. *Id.* Strict scrutiny is not satisfied until the State has met a two part test: articulation of a compelling state interest, and a showing that there is no other manner to protect the state's compelling interest. *Id.* Thus, even accepting the morality and family values bases supporting the discrimination as compelling state interests, there is no showing here that there is no other manner of protecting morality and family values other than prosecuting same sex sodomy. It would appear that the state's goal of protecting these interests was originally achieved on a non-discriminatory basis when the prohibition of sodomy applied to all persons. *See* n. 8, *supra.* There are other avenues for achieving the State's objectives without resorting to 21.06 as pointed out by the court in *Onofre. See* n. 13, *supra.* It is manifestly illogical to suggest that sodomy, when performed by heterosexuals promotes morality and family values, and that the same acts when performed by same

sex couples, denigrates morality and family values.

As noted above, implicitly rejecting "morality" and "family values" as justifications for Colorado's discriminatory constitutional amendment, the United States Supreme Court struck down the amendment under a rational basis standard. *See* n. 12, *supra.* Logic dictates that if the promotion of morality norms and family values as rationalizations for state sponsored discrimination will not pass a rational basis standard of review, such contentions would wilt in the face of strict scrutiny mandated by *McLean.* I conclude, therefore, that because the State has not shown there are no alternate means to protect the State's asserted interests of family values and morality other than through the gender-based discrimination in 21.06, the statute violates Article I, § 3a of the Texas Constitution and is, therefore, void. *See* TEX. CONST. Art. I, § 29.

Accordingly, I would sustain appellant's point of error two challenging 21.06 under the Texas ERA.

## V.

### Conclusion

Analyzed correctly under binding Supreme Court precedent, Texas Penal Code section 21.06 is in violation of the Equal Protection Clause of the Federal Constitution because it is neither rationally related to the legitimate State objective presented for its support, nor viable under heightened scrutiny because the State failed to articulate a compelling interest served by the gender discrimination exhibited by 21.06 on its face and as applied. Further, under the Texas Bill of Rights, because the gender discrimination in 21.06 contravenes the Equal Rights Amendment, it is automatically void without regard to any justification.

**384**

The holding here that 21.06 is unconstitutional is not tantamount to a conclusion that there is nothing wrong with the prohibited conduct. The majority correctly states that mere disagreement with the Legislature over whether the conduct proscribed by 21.06 is or is not a bad deed is not a basis for overturning a statute. This statement, however, is incomplete because it ignores the duty a judge has when confronted by a statute in conflict with the constitution.

The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree or dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the constitution as the paramount law, whenever a legislative enactment comes in conflict with it. In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will [expressed in the constitution]. If an act of the legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law.

*Ex parte Rodriguez,* 39 Tex. 705, 751 (1873).

The Texas Constitution does not protect morality; it does, however, guarantee equality to all persons under the law. TEX. CONST. art. I, § 3a. My personal views on the conduct involved here are irrelevant to the outcome that I believe is required. The foregoing is my duty in the preparation of opinions because Cannon 3B(5) of the Texas Code of Judicial Conduct requires a judge to "perform judicial duties

without bias or prejudice." Thus, the result reached in this dissent is purely a function of the application of the Texas and Federal Constitutions to section 21.06, and nothing more. Accordingly, I respectfully dissent.